J-S08028-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.E. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.D. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1516 WDA 2019 |

Appeal from the Order Entered September 16, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court
at No(s):  CP-02-AP-0000094-2019

BEFORE:  OLSON, J., McCAFFERY, J., and MUSMANNO, J.

MEMORANDUM BY McCAFFERY, J.:　　　　　　　　**FILED MARCH 10, 2020**

D.D. (Father) appeals from the order entered[1] in the Allegheny County Court of Common Pleas Orphans' Court granting the petition of the Allegheny County Office of Children, Youth and Families (OCYF) to terminate involuntarily Father's parental rights to his child, A.E. (Child), pursuant to subsections 2511(a)(2), (5), (8), and (b) of the Adoption Act.[2]  After review, we affirm.

---

[1] The subject order was **dated** September 13, 2019.  However, we deem the order **entered**, for purposes of appeal, on September 16, 2019, the date notice pursuant to Pa.R.C.P. 236(b) was provided.  **See** Pa.R.A.P. 108(b) (date of entry of order shall be the day on which clerk makes notation in docket that notice of entry of order has been given as required by Pa.R.Civ.P. 236(b)).

[2] 23 Pa.C.S. §§ 2101-2938.  By same order, the Orphans' Court also involuntarily terminated the parental rights of Child's mother, S.L.E. (Mother),

Child was born in December of 2017 to Father and S.L.E. (Mother).[3] Mother "has a lengthy history with OCYF, dating back to 2009;" her four older children were in the care of relatives. Orphans' Ct. Op., 11/8/19, at 1; N.T. Termination H'rg, 9/13/19, at 60-61. "OCYF received a report of suspected drug use by Mother at the birth of Child," and Mother "admitted to smoking marijuana throughout her pregnancy." Orphans' Ct. Op. at 2. However, "[n]o action was taken, and Child was discharged from the hospital into the parent[s'] care." *Id.*

On January 26, 2018, when Child was approximately six weeks old, she presented to the Children's Hospital of Pittsburgh with severe dehydration and malnourishment. Dr. Jennifer Clarke, a child abuse pediatrician at the hospital — who was qualified as an expert in child advocacy and child abuse at the termination hearing — testified Child was "emaciated" and "had virtually no subcutaneous fat, which was abnormal based upon her age." Orphans' Ct. Op. at 3; N.T. at 9, 11. Child was hospitalized through February 6th. The following day, OCYF obtained an emergency custody authorization and Child

---

as well as an "Unknown Father," pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).

[3] Child's birth certificate did not list a father, but Mother identified Father, as Child's father, to an OCYF caseworker. *See* OCYF's Petition for Involuntary Termination of Parental Rights, 5/15/19, at 2. OCYF's petition also sought, and the Orphans' Court granted, termination of an "Unknown Father's" parental rights.

was placed in shelter care at a foster home. N.T. at 37. OCYF was ordered to file a dependency petition. Dr. Clarke saw Child on February 9th (three days after she was discharged) and opined Child "had gained a significant amount of weight and had increased body fat." Orphans' Ct. Op. at 3; N.T. at 11. Nevertheless, Child was diagnosed with failure to thrive. *Id.*

The Orphans' Court summarized:[4]

On February 14, 2018, Allegheny County Police charged Father with two counts of Aggravated Assault[,] based upon [the hospital's reports that] Child's condition was considered a near death/fatality event. A no-contact order was entered precluding [both parents] from having any physical contact with Child.

Orphans' Ct. Op. at 3; *see also* N.T. at 38.

"OCYF filed a Dependency Petition, but the hearing was continued a number of times for various reasons." Orphans' Ct. Op. at 3. Meanwhile, Child was placed with her current foster home in March of 2018. N.T. at 37.

OCFY made referrals for in-home services on April 10th, 2018. Child was adjudicated dependent on June 1st, 2018, and the Court ordered Child to remain in her foster home. The no-contact order was lifted, and Father was granted visitation once a week [beginning in June of 2018.[5]] Father was ordered to attend Parenting classes, attend forensic evaluations, to cooperate with in-home services, and to attend to his legal issues.

The parties appeared for a Permanency Hearing on September 4th, 2018. [At this time, Child was eight months old.] Father was found to be in minimal compliance with the Permanency Plan as

---

[4] For ease of discussion, we have modified the Orphans' Court references to "the child" to comport with our appellation "Child." We have also corrected the opinion's spelling of Dr. Clarke's name.

[5] N.T. at 16.

he had not attended visits consisten[tly], had not attended his forensic evaluation, had not participated in parenting classes, and was only minimally working with in-home services. The Court found that Father ha[d] made minimal progress towards alleviating the circumstances which brought Child into care, and visitation was reduced to every other week. Father was ordered to undergo a forensic evaluation, address his legal issues, and to attend parenting classes.

Orphans' Ct. Op. at 3-4.

In November of 2018, Father and Mother had twins, who apparently were also placed in the care of OCYF. *See* N.T. at 18. Thereafter, the parents' supervised visits included Child and the twins together. *Id.*

The Orphans' Court summarized:

On February 7th, 2019, Father pled guilty to one count of Endangering the Welfare of a child as a result of the charges that originated when Child was admitted into Children's Hospital . . . . He was sentenced to serve two years of probation.

The parties appeared for a [second] Permanency Hearing on February 12th, 2019. Father was found to be minimally compliant with the service plan as he was not attending visitation consistently. The Court found that Father had made minimal progress toward alleviating the circumstances which caused Child to come into care. Father was ordered to attend a parenting program through TRAC [(Three Rivers Adoption Council)] and attend updated forensic evaluations with [court-appointed psychologist Neil Rosenblum, Ph.D.] The Court ordered in-home services to close and for Father to comply with the terms of his probation. . . .

Orphans' Ct. Op. at 3-4 (paragraph break added).

Dr. Rosenblum evaluated Father individually, conducted two "interactional" evaluations by observing both parents and Child together, and

further conducted "interactional" evaluations of Child with her foster parents.

N.T. at 63, 66, 67. Dr. Rosenblum later testified at the termination hearing:

> [Father] has a very concerning pattern of not being able to sustain relationships. [Additionally, Father gave "an account of his life, including educational accomplishments, that . . . were rather bizarre."] He indicated that he was in medical school, nursing school, [and] a whole bunch of other things that . . . clearly seemed to be fabricated[.]
>
> [Father] doesn't have . . . problems with emotional regulation. He tends to stay calm. But there's just that lack of . . . validity in what he says. Even [M]other indicated that she sometimes has problems believing him and knowing whether he's telling the truth[.]
>
>        *    *    *
>
> [Dr. Rosenblum's testing revealed that Father] basically was very content with his life. [Father] thinks that he's charming, creative, gets along with people. He did indicate that he tends to worry over what he called stupid stuff. But that's just a . . . pattern of — I don't know if the right word is deceptiveness, but there's a pattern of just not really paying attention to the truth and weaving somewhere between truth and fantasy a good deal of the time. It's probably more of a personality disorder dimension than actual problem with like a mood disorder or depression or anxiety. It's just sort of a pattern of fabricating and not being able to be consistent with what he says or consistent with job responsibilities or relationships with others.

*Id.* at 64-65. Dr. Rosenblum diagnosed Father with "an adjustment disorder, mixed disturbance of emotions and conduct, unspecified trauma . . . and antisocial and paranoid personality traits." *Id.* at 65. Dr. Rosenblum opined Father's issues "point to somebody who is kind of drifting through life and not . . . being able to really demonstrate the responsibility . . . required to care for a child." *Id.* at 66. Finally, Dr. Rosenblum testified that although Father

was able to calm Child during the evaluation — as Child was crying and "extremely upset" by being separated from her foster mother — "there really was no meaningful attachment between" Child and either parent. *Id.* at 66-67.

On May 15, 2019, OCYF filed a petition to involuntary terminate both Mother's and Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). The Orphans' Court conducted a hearing on September 13, 2019; at this time, Child was approximately 21 months old. We note Child was represented by an attorney, who argued in favor of termination.

OCYF presented the testimony of Dr. Clarke, as well as TRAC caseworker Sara Sisco, who oversaw Child's placement in foster care and supervised the parents' visits with Child. Caseworker Sisco stated that TRAC's policy requires parents to confirm a visitation two hours in advance, but Child would be transported to the office and both parents would fail to attend. N.T. at 17. Thus, two months after visits began, the parents were required to arrive one hour prior to visitation. *See id.* Over the course of 15 months, Father had 34 total scheduled visits with Child, but only attended 17. *Id.* at 21. Before the twins joined, Father attended four visits with Child, during which he spent some time interacting with Child, but a "majority of" the time checking his phone and watch. *Id.* at 27-28. After the twins joined the visits, Father no longer interacted with Child. *Id.* at 27. Father has not attended any of Child's medical appointments. *Id.* at 31. Finally, Caseworker Sisco stated Child was

"thriving in her foster home," she has a bond with and is "very, very connected to her foster parents," and the foster parents were meeting all of Child's medical needs and services. *Id.*

OCYF caseworker Amber Saunders[6] testified Father did not meet his permanency plan goals: he failed to engage with any mental health services, failed to remedy the conditions which brought Child into care, and was not consistent with visitation and parenting classes. N.T. at 41-42. Caseworker Saunders stated she gave both parents ample bus tickets to attend the visits, but Father "often reported he didn't have enough bus tickets, or there would be . . . concerns with the weather and different things that [caused him to] cancel." *Id.* at 41, 46. Neither parent understood or took responsibility for his/her role in Child coming into care, and "they do not feel that they were responsible for her emaciated condition." *Id.* at 55. Instead, the parents told Caseworker Saunders "they had left [Child] in the care of a maternal uncle," and thus because "they were not actively caring for her, they don't feel that they were responsible." *Id.* Caseworker Saunders testified that the parents "still chose a caregiver and did not follow up her with her medical care." *Id.* She further testified:

> Father denied a need for mental health treatment. However, I
> became concerned in my interactions with him. He struggled with
> just understanding case planning. He oftentimes gives false

_____

[6] Caseworker Saunders did not observe Father's visitations with Child. N.T. at 42.

information with no real apparent reason why. (Inaudible) seem to matter or affect the parenting ability with the child.

*Id.* at 53-54. Finally, we note the caseworker also stated Child was thriving in her foster home and has "a noticeable bond" with her foster parents. *Id.* at 42-43.

Finally, Dr. Rosenblum testified as summarized above. We add he also stated "there really was no meaningful attachment between" Child and either parent, and termination would not cause any detrimental effect on Child. N.T. at 67-68. Although Dr. Rosenblum's report stated that Father "believes he has a good bond with [Child] and that she doesn't want to leave his arms," Dr. Rosenblum disagreed with Father's assessment. *Id.* at 76. Instead, Dr. Rosenblum testified that in both of his "interactional" evaluations, Child was distressed, and "[i]t was worse the second time than the first." *Id.* Child's "primary attachment and bond" is, "[w]ithout a doubt," to her foster parents. *Id.* at 68. Dr. Rosenblum added that Child "has no attachment to her twin siblings." *Id.* at 74. Finally, the psychologist testified neither parent acknowledged or took responsibility for his/her role in Child going into care, and instead, "[t]hey felt it was . . . other relatives who were responsible."[7] *Id.* at 76.

_____

[7] OCYF also called therapist Ronald Schulz, who offered testimony with respect to Mother only. N.T. at 4-7.

Mother and Father were each represented by counsel, and both testified. Father stated he did interact with Child during visits, and he brought her a book bag, toys, and a comic book. N.T. at 88. Father denied using his phone to call or text anyone, but instead he played songs for Child. *Id.* at 89. When asked why he missed visits, Father testified that due to work scheduling conflicts, he had asked Caseworker Saunders to reschedule the visits in "September"[8] and furthermore, Caseworker Saunders did not give him enough bus tickets. *Id.* at 89-90. Father also stated he could not start mental health sessions at Mercy Behavioral because Caseworker Saunders did not, as he requested, provide a necessary referral.[9] *Id.* at 91. Finally, Father denied

_____

[8] Father did not explain whether this occurred in September 2018 or 2019, nor whether his work schedule had interfered with visits at other times of the year. *See* N.T. at 90.

[9] Caseworker Saunders, meanwhile, denied Father told her he needed a referral from OCYF to attend mental health treatment. N.T. at 47. She further explained that, in any event, she contacted Mercy to inquire as to how Father could attend:

> I can't make a direct referral to Mercy. [Patients] go on their own. They complete an intake appointment, and they begin their therapy sessions. The release is signed so that I can communicate with the therapist once they are attending. [Father] didn't begin attending.
>
> *      *      *
>
> . . . If [patients] do not go back [after the initial intake] and cooperate to get an ongoing therapist, there is nobody for me to call.

*Id.* at 48-49.

that in-home services were meant for him, and instead, stated they were intended solely for Mother. *Id.* at 92.

By order dated September 13, 2019, and entered September 16th, the Orphan's Court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). On October 8, 2019, Father filed a timely, counseled notice of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

On appeal, Father raises the following issues for our review:

I. Whether the [Orphans'] Court committed fatal error and/or abused its discretion in finding [OCYF] met [its] burden of proof and proved by clear and convincing evidence that the parental rights of [Father] should be terminated pursuant to 23 Pa.C.S.[ ] § 2511 (a)(2), (a)(5), and (a)(8)?

II. Whether the [Orphans'] Court erred and/or abused its discretion by finding that [OCYF] met [its] burden of proof and proved by clear and convincing evidence that terminating the parental rights of [Father] best meets the needs and welfare of the minor child pursuant to Pa.C.S.[ ] § 2511(b)?

Father's Brief at 5.

In his first issue, Father argues the Orphans' Court erred in finding OCYF met its burden of proving grounds for termination of his parental rights. Father's Brief at 11. He asserts the conditions that led to Child's placement can be remedied. Father acknowledges "[h]e did have difficulty sometimes achieving his goals due to . . . conflict[s] in his work schedule and delayed responses from" Caseworker Saunders, but he "did make progress." *Id.* In

- 10 -

support, Father avers he attended parenting training and maintained employment so that he could provide financially for Child.

We note the relevant standard of review:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. . . . We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*) (citations omitted). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the

needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). In order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d at 384. Here, we analyze the court's termination decree pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \* \* \*

- 12 -

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . . .

23 Pa.C.S. § 2511(a)(2), (b).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (citation omitted).

In finding grounds for termination of Father's parental rights, the Orphans' Court considered further details of the testimony presented at the hearing:

> Father's goals were minimal and certainly reasonable. He was offered services to remedy the conditions which caused Child to come into care. He was court ordered to attend parenting, work with in-home services, undergo forensic evaluations, and attend visitation. For much of the case, his only requirements were that he attend parenting and visitation.

[Visitation did not begin] until June of 2018. These visits were weekly throughout the summer but ultimately reduced to bi-weekly in September of 2018. The parents were required to appear one hour prior to the start of the visit based upon their inconsistent attendance throughout the summer. Neither parent attended visitation consistently, often missing months of visits. Father did not attend any visits in October or November of 2018. He did attend one visit in December and both visits in January and February of 2019. [TRAC Caseworker] Sisco reported that therapeutic visitation was instituted at the end of February of 2019 in an effort to assist Father in his interactions with Child. The TRAC therapist canceled one visit in March of 2019, and Father attended one therapeutic visit on March 20th, 2019. Father did not attend any visitation in April and attended only one visit in May and one in June of 2019. As a result of missing these therapeutic sessions, Father was discharged from the therapeutic visitation program. The visits reverted back to regular visitation with a parenting component. Father attended both visits in July and one out of two in August of 2019. In total, Father attended 17 out of 34 scheduled visits with Child. During the visits that Father actually attended, he struggled to develop a relationship with Child. [Caseworker] Sisco reported Child typically did not receive as much attention as her siblings[ ] and that Father often played on his phone.

[Caseworker] Sisco reported that Father did not attend any of Child's medical appointments. [OCYF Caseworker Saunders] reported that she notified Father of the dates and times of these appointments but that he failed to attend any.

Dr. Rosenblum . . . conducted forensic evaluations of the family in July and October of 2018 and March and April of 2019. Father failed to attend his scheduled evaluation in July of 2018 but did attend an interactional evaluation in October of 2018. Dr. Rosenblum noted that Father was able to successfully feed Child but struggled to engage her in any age appropriate activities other than cell phone videos. Father did demonstrate a positive attitude during the evaluation and what Dr. Rosenblum deemed to be "well intentioned" interactions with [Child].

Father attended an individual and interactional forensic evaluation on April 1, 2019. During the interactional evaluation, Child struggled to separate from her foster mother. Father was able to soothe Child during his portion of the interactional

evaluation. Father gave Child his cell phone and [played] songs familiar to her. She was responsive to Father[,] although Dr. Rosenblum opined that it was unlikely that she would have remained calm if not for the cell phone videos.

Orphans' Ct. Op. at 6-8 (paragraph break added). The Orphans' Court also considered Dr. Rosenblum's testimony, summarized *supra*, about Father's diagnoses, and that Father "displayed a concerning pattern of not being able to sustain relationships" and Father "made a number of false statements . . . during the evaluation about his educational and professional endeavors." *Id.* at 8. Finally, the Court found:

During the evaluations, Father never accepted responsibility for Child's medical condition[,] despite being deemed an indicated perpetrator of child abuse and pleading guilty to criminal charges. He blamed a family member whom he claimed provided care for Child for a brief period after she was born. Additionally, Father has struggled to accept the medical issues caused by the early trauma inflicted upon his child as an infant.

*Id.* at 9.

A review of the record supports the Orphans' Court's finding of grounds for termination under Section 2511(a)(2). We emphasize the Court's finding that Father "never accepted responsibility for Child's medical condition," and Caseworker's Saunders' testimony that even if another individual had caused Child's "emaciated" condition, it was Father and Mother who placed Child in that person's care, and they failed to obtain medical care for Child until the

day she was admitted to Children's Hospital.[10]  **See** Orphans' Ct. Op. at 9; N.T. at 55.

To the extent Father argues a lack of reasonable efforts on the part of OCYF, this claim is without merit.  Our Supreme Court has rejected the argument that the provision of reasonable efforts by the county children's services agency is a factor in termination of the parental rights of a parent to a child.  **In the Interest of D.C.D.**, 105 A.3d 662, 673-74, 675-76 (Pa. 2014) (concluding that under 23 Pa.C.S. § 2511(a)(2) there is no review of agency's provision of reasonable efforts, and rejecting contention that agency must provide reasonable efforts to enable parent to reunify with child prior to termination of parental rights).

We agree OCYF established that: Father exhibited "repeated and continued incapacity, abuse, neglect or refusal;" this caused Child "to be without essential parental care, control or subsistence necessary for [her] is physical or mental well-being;" and Father cannot or will not remedy the "causes of the incapacity, abuse, neglect or refusal."  **See In re Adoption of C.D.R.**, 111 A.3d at 1216; **In re Adoption of M.E.P.**, 825 A.2d at 1272.  We thus do not disturb the Orphans' Court's ruling under Section 2511(a)(2).  **See** 23 Pa.C.S. § 2511(a)(2); **In re B.L.W.**, 843 A.2d at 383.  We need not

---

[10] As an example of this lack of understanding of Child's history of malnourishment, Caseworker Sisco testified Father had called Child "chunky butt."  N.T. at 33.  Father testified this comment "was positive, like you're getting bigger, healthier."  **Id.** at 89.

- 16 -

address any other subsections of Section 2511(a). *See In re B.L.W.*, 843 A.2d at 384.

In his second issue, Father argues OCYF failed to establish, pursuant to Section 2511(b), that termination of his parental rights would serve Child's developmental, physical, and emotional needs and welfare. He asserts the Orphans' Court "focused on [his fault] and relied on [his] lack of progress to justify its finding in regard to needs and welfare." Father's Brief at 18.

This Court has stated:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." [T]he determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

"While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child."

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (citations omitted).

We reiterate Caseworker Sisco testified Father only had four visits with Child prior to her siblings joining the visits — during which he spent "a

majority" of the time checking his watch and phone — and that after her siblings joined the visits, Father no longer interacted with Child. N.T. at 27. Dr. Rosenblum testified that despite Father's belief he has a good bond with Child, Dr. Rosenblum opined there "was no meaningful attachment between" Child and Father. N.T. at 67, 76. Dr. Rosenblum testified:

> Visitations are extremely distressful for [Child], in my opinion, and I believe a goal of adoption is the only viable outcome that will continue to allow this child to have an opportunity for sustained growth and health in terms of emotional functioning and even in terms of her physical and medical well-being.

*Id.* at 68-69. When asked about the potential impact if removed from foster parents, Dr. Rosenblum responded:

> I think that would have a disastrous impact. [T]hese are the only people that [Child] has known. They are intricately related and are involved with every aspect of her life. They represent her security, her ability to develop a sense of trust and well-being in the world, and . . . they've done an exceptional job. So that would be emotionally devastating to [Child].

*Id.* at 76-77. Furthermore, the Orphans' Court reasoned:

> Child has been in the same foster home since March of 2018. Dr. Rosenblum conducted an interactional evaluation of the foster parents and Child in March of 2019. He opined that Child had a very healthy and secure attachment to her foster parents. He notes that Child required a great deal of early intervention services while in foster care and that the foster parents have provided outstanding care in that regard. Dr. Rosenblum credits the foster parents with the great progress that Child has made. Ultimately, he opined that Child's primary attachment is with the foster parents and that termination would not have any negative effect on Child. Dr. Rosenblum noted in his report that Child has not formed a meaningful attachment to Father and that she is unlikely to develop one.

- 18 -

> [TRAC Caseworker Sisco] reported that Child has a strong bond with her foster parents and that they have been able to meet all of her medical needs. [OCYF Caseworker Saunders] has observed Child with the foster parents, and opined that Child is thriving in their care. [Caseworker] Saunders also opined that Child had a noticeable bond with the foster parents and that they have been meeting her developmental, physical and emotional needs.

Orphans' Ct. Op. at 10.

Upon review, we again discern no abuse of discretion. The record supports the Orphans' Court finding that Child's developmental, physical and emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b). *See T.S.M.*, 71 A.3d at 267.

For the foregoing reasons, we conclude the Orphans' Court appropriately terminated Father's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/10/2020

- 19 -